

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MEF/PGS/JLG
F. #2020R00559

*610 Federal Plaza*
*Central Islip, New York 11722*

June 9, 2026

<u>By ECF</u>
The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

> Re:   United States v. Kevin Cuevas Del Cid
>        <u>Criminal Docket No. 20-251 (S-1)(JMA)</u>

Dear Judge Azrack:

The government respectfully submits this letter in advance of the sentencing of defendant Kevin Cuevas Del Cid ("Cuevas Del Cid" or the "defendant"), which is presently scheduled for July 7, 2026 at 1:00 p.m.

On July 16, 2025, the defendant, a member of the violent transnational criminal organization La Mara Salvatrucha, also known as the MS-13, pleaded guilty to Count One of the superseding indictment, charging racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963. As part of that plea, the defendant admitted his participation in the racketeering acts of the May 21, 2016 murder of Kerin Pineda, the October 10, 2016 murder of Javier Castillo, and a conspiracy to distribute cocaine and marijuana. Prior to pleading guilty, on July 6, 2022, the Court granted the government's motion to transfer the defendant to adult status for trial. ECF No. 58.

As set forth in the Presentence Investigation Report ("PSR"), dated April 2, 2026, the defendant's total offense level is 42 (PSR at ¶ 63) and his total Criminal History Score is zero (PSR at ¶ 6), which together yields an advisory Guidelines sentencing range of 360 months' to life imprisonment. PSR at ¶ 107. While the government concurs with this calculation, the parties' plea agreement (the "Plea Agreement") provides for a sentencing range of 420 months to 540 months' imprisonment (or 35 to 45 years), pursuant Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. <u>See</u> Plea Agreement at ¶ 3. Provided the Court accepts the Plea Agreement, the defendant must be sentenced within the agreed-upon range.

On April 16, 2026, the defendant submitted a sentencing memorandum wherein he requested a sentence of 35 years in prison. ECF Dkt. No. 434 (Defense Sentencing Memorandum, hereinafter "Def. Mem." at 1). This request is based on the false assertion that the defendant's role was "'minor' in the execution" of the conduct, as well as mitigating factors, including his background, medical condition and conditions of confinement. Def. Mem. at 27. For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in 18 U.S.C. § 3553(a) as well as the those set forth in Miller v. Alabama, 132 S.Ct. 2455 (2012), in particular, the seriousness of the offense, history and characteristics of the defendant, need for deterrence, and need for the sentence to provide a just punishment, the Court should sentence the defendant to a term of 42 years' custody, less 24 months to reflect his prior conviction for relevant conduct.

## I.     **Background**

### A. May 21, 2016 murder of Kerin Pineda ("Pineda") (PSR ¶¶ 14-16)

In May 2016, 20-year-old Pineda was reported missing by his family, and efforts to locate him by local law enforcement authorities proved unsuccessful. In October 2017, agents and officers of the Task Force conducted a search of a heavily wooded area near the Merrick-Freeport border, after a witness informed them that the MS-13 may have killed and buried one or more victims in the area. On October 27, 2017, members of the Task Force located a body buried in the area, and subsequent DNA testing confirmed the body to be that of Pineda.

The investigation determined that Pineda was murdered by MS-13 members of both the Hollywood clique, including the defendant, and the Sailors Locos Salvatruchas Westside ("Sailors") clique, because Pineda was believed to be a member of the rival 18th Street gang. To lure the victim to his death, the defendant set up a Facebook page (the "Facebook page"), on which he posed as a female, and initiated contact with Pineda, who admitted that he belonged to the 18th Street gang in online messages. After approval was obtained for the murder, the defendant and other MS-13 members and associates carried out the plan to kill Pineda.

On the day of the murder, the defendant, who was posing as a female, invited Pineda to meet him in a wooded area in Freeport to smoke marijuana. That night, in preparation for the murder, members of both the Sailors and Hollywood cliques, including the defendant, met to carry out the murder. While the MS-13 members were in the woods, the defendant continued to text with Pineda to lure him into the woods. When Pineda arrived, he said he was looking for a girl, and the MS-13 members asked him whether he was a member of 18th Street. Despite Pineda's denials, the MS-13 members told him they were from the MS-13, and knew he was 18th Street; and viscously attacked and killed Pineda. All six MS-13 members, including the defendant, took turns slashing and hacking Pineda with the machetes. The MS-13 members then buried Pineda's body in a hole in the ground that the defendant and his associates had dug the day before the murder. Before leaving the crime

scene, the MS-13 members contacted the gang members engaged in surveillance to make sure that there was no police presence or any witnesses outside the woods. They then walked out of the woods and were driven away in the two vehicles.

### B. October 10, 2016 Murder of Javier Castillo ("Castillo") (PSR ¶¶ 17-19)

On October 13, 2016, Castillo, who was 15 years-old, was reported missing by his family to the Suffolk County Police Department ("SCPD"). Subsequent investigation by the SCPD determined that Castillo was last seen alive by family members on the afternoon of October 10, 2016, and that his cellular telephone was last active on that date. Castillo's brother informed the SCPD that he was told by a family member, who had ties with the MS-13, to stop looking for Castillo, because he was already "gone and buried."

The Task Force investigation ultimately determined that the defendant and several other members and associates of the Sailors clique of the MS-13 – including the clique's New York leader and its local leader – murdered Castillo because they believed he was a member of the rival 18th Street gang, and possibly bore an 18th Street tattoo on his hand.

The MS-13 members devised a plan, in which another gang member who was friendly with Castillo, would lure him to a secluded location under the guise of smoking marijuana together. On the night of the murder, Castillo piled into a car with other MS-13 members and associates in Brentwood, and drove to Freeport – over 20 miles away – where they met several other MS-13 members, who invited Castillo to smoke marijuana with them in nearby Cow Meadow Park. Once the group arrived at the park, the MS-13 members and associates lured Castillo through the woods, to an isolated saltwater marsh, where they viciously attacked him with a machete. The MS-13 members and associates, including the defendant, took turns hacking Castillo with the machete until he was dead. They then dug a hole and buried Castillo's body.

On October 24, 2017, members of the Task Force conducted a search at Cow Meadow Park and located a body in an advanced state of decomposition, buried in the marsh along the water. Subsequent DNA testing by the Nassau County Medical Examiner's Office ("NCME") confirmed that the body was Castillo.

### C. August 2017 Murder Conspiracy and the State Case (PSR ¶ 65)

In or about July 2017, the Drug Enforcement Administration ("DEA"), working with the Nassau County District Attorney's Office ("NCDAO"), and with the assistance of the Task Force, was investigating members of the Sailors and Hollywood cliques of the MS-13 in connection with multiple murders in Nassau County. As part of that investigation, the NCDAO obtained multiple court-authorized eavesdropping warrants, including at least two warrants for telephone numbers being utilized by the defendant. In August 2017, while monitoring the defendant's communications, law enforcement intercepted multiple communications and conversations discussing the gang's ongoing sale of marijuana and

3

cocaine, and, more significantly, the plan to murder a rival gang member.  During that call, the defendant had the following exchange with a fellow gang member:

| | |
|---|---|
| Gang Member: | And what's up? |
| Defendant: | No, I want to hurt him, but we don't have the tools, dog. |
| Gang Member: | No, it's fucked up dog. |
| Defendant: | So I'm there, this mother fucker I can take him to the fucking woods. |
| Gang Member: | I don't know what's up dog. |
| Defendant: | The problem is that I don't want to mention it to him because first we don't have the things ready dog. |
| Gang Member: | Right, there is nothing right now. |
| Defendant: | Right, and while we start moving around... you know maybe this guy will get out of control. |
| Gang Member: | Right, it is better to get those things first. |
| Defendant: | We have to take them to the woods over there. It is a matter of getting them and taking them to the woods. We have to hurt him this week. Look. |

\*\*\*

| | |
|---|---|
| Gang Member: | He was alone? |
| Defendant: | Yes dog he was alone coming from there to here. |
| Gang Member: | You should have left him there. |
| Defendant: | I think we can hit him this week, this weekend I told... I was doing a farewell with some morras (girls) and caught him. Without any [Unintelligible]. That thing can be done. |
| Gang Member: | Yes, you can take him there, that morro by where the "Payo" (piles) are caught. By all that, a little ways down from the bridge. We have to check there to see if there are cameras. |
| Defendant: | Mhmm. I don't think there are any there, dog. There are no cameras. |
| Gang Member: | You can take him there going in there. It all depends on the time we get that, because the truth is that is early... |

4

| | |
|---|---|
| | [Voices Overlap] |
| Defendant: | Uh huh. I asked him if he wanted to go to the woods to walk around with me and some doggies. The guy said he wants to go. He said yes, but like I said I don't do it because you know. I haven't told the homeboys because they are going to tell me that I don't have shit ready, and you know. |
| Gang Member: | Yes, I can imagine. |
| Defendant: | It's best I don't tell them anything. I will just have him here dog. |

Based on this intercepted communication, as well as additional ongoing investigation, law enforcement was able to intercede, thereby preventing the defendant and other MS-13 members from harming the intended victim.  Specifically, on or about July 20, 2017, i.e., the day after the aforementioned call, immigration authorities lawfully stopped a car in which the defendant was traveling in Glen Cove, New York, and placed him under arrest.

On January 8, 2018, the defendant was indicted by a grand jury in Nassau County, New York and charged in state court with, inter alia, Conspiracy to Commit a Class A Felony, which was Murder in the Second Degree, in connection with the Murder Conspiracy (the "State Indictment").  The murder conspiracy was alleged to have occurred on or about July 19, 2017, the day before he was apprehended.  On January 10, 2018, the defendant was arrested pursuant to the State Indictment and transferred to state custody for prosecution.

On June 14, 2018, the defendant pleaded guilty in Nassau County to Conspiracy in the Second Degree, a Class B felony.  During that court proceeding, the defendant admitted that: on July 19, 2017, he encountered someone who he planned to murder by luring him into the woods by offering marijuana; on that same day, he contacted another gang member and proposed a location for the murder and asked him to do reconnaissance; and on the same date he directed other gang members to obtain the necessary tools.  In exchange for his plea, the Court agreed to sentence the defendant to a term of three to nine years' custody. On January 16, 2020, the defendant was released from state custody after serving 24 months in prison.

D. <u>Conspiracy to Distribute Cocaine and Marijuana</u>

Between January 2016 and October 2017, the defendant, along with other members of the Sailors clique, sold cocaine and marijuana. The gang members would return the money made from drug dealing back to the clique and we would use the money to buy more drugs, to buy weapons and ammunition, and to wire money to clique leaders in El Salvador.

E.  <u>Post-Arrest Conduct (PSR ¶ 20)</u>

The defendant has received multiple disciplinary infractions while at MDC-Brooklyn.  Specifically, on May 25, 2020, there was an altercation at the MDC over the use of the telephones between inmates who belonged to the MS-13 gang, including the defendant, and inmates from another gang.  When subsequently interviewed, the defendant admitted that the fight was over the phones.

On March 7, 2023, during a search of the unit where the defendant and numerous other MS-13 members and associates are presently housed, prison officials recovered two metal objects in the defendant's locker, pictured below:



During the same search, officials recovered a Samsung phone from one of his co-defendants. The device contains numerous "selfie" and other pictures of the defendant, which are from in or around February and March 2023. In one example, below, the defendant poses with two fellow Sailors clique members, and they are all wearing rosary beads with an anchor, which are symbolic of their membership in the Sailors clique of the MS-13.



The search team also recovered a photograph, which was taken inside of the MDC, of more than a dozen known members of the Sailors clique, including the defendant. In the photograph, the defendant and other gang members are again wearing the modified Sailors themed rosary beads.  A copy of the photograph is below:



On May 18, 2024, the defendant was found to be in possession of a cellular telephone.

Most recently, on April 8, 2026, the defendant was found to be in possession of a large, sharpened metal object.  A photo of the metal object is below:



F.  Procedural History

The defendant, who was 16 years old at the time of the two murders, initially was charged as a juvenile, by complaint, on February 4, 2020.  ECF No. 1.  On April 3, 2020,

he appeared by telephone, was arraigned on the complaint, and detained.  ECF No.'s 3-5.  On May 20, 2020, the defendant was charged by juvenile information.  ECF No. 7.  On October 5, 2021, the government filed a motion, pursuant to 18 U.S.C. § 5032, seeking to transfer the defendant to adult status for trial.  ECF No. 40.  The defendant opposed the motion, and on June 3, 2022, the Court held a hearing. ECF No. 54.  On July 6, 2022, the Court issued an order transferring the defendant to adult status.  ECF No. 58 (the "Transfer Opinion").

In the Transfer Opinion, the Court observed that the "extremely violent nature" of the alleged offenses "overwhelmingly favor[ed]" transferring the case to district court because the defendant "actively participat[ed] in two murders in aid of the MS-13 gang, as well as with distributing narcotics to finance gang operations."  Transfer Opinion at 2.  More specifically, the defendant "instigat[ed]" the murder of Kerin Pineda, "obtained permission from clique leaders to proceed with the murder," "facilitate[ed] the murder by luring Pineda via Facebook communications to a wooded area in Freeport, New York, where other MS-13 members were waiting to kill him, and where Pineda was then murdered, and later, brought "Castillo, another suspected member of the 18th Street Gang, to an isolated area by the water in Freeport in order to murder him . . . [and] with other gang members, str[uck] Castillo with a machete until he was dead."  Id. Consistent with the statutory requirements, the Court likewise considered the defendant's age and social background, in addition to his ongoing involvement with the MS-13 after the Pineda and Castillo murders, and concluded that despite many "positive social influences that should have kept him from gang involvement, the defendant chose to join the MS-13 gang and [] participate in two murders."  Id. at 11.

On September 6, 2022, the grand jury returned a superseding information in the above-captioned matter, charging the defendant with racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963, VICAR murder, in violation of 18 U.S.C. § 1959(a)(1), and drug trafficking, in violation of 21 U.S.C. §§ 846, 841(b)(l)(C) and 841(b)(l)(D).  On July 16, 2025, the defendant pleaded guilty to racketeering, as set forth above.

II.    **The Defendant Should Be Sentenced to 42 Years in Prison**

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 42 years' incarceration.  Consistent with the plea agreement executed by the parties, the government agrees that the ultimate sentence imposed should reflect a 24 month credit for the time served in New York State custody for relevant conduct, pursuant to U.S.S.G. § 5G1.3(b).

A.    Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a).  Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]"  Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S.

38, 46-49 (2007)).  However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence.  <u>Kimbrough</u> at 108 (citing <u>Gall</u> at 50 and <u>Rita v. United States</u>, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a).  <u>Id</u>.  That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

In <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), the Supreme Court discussed the differences between juvenile and adult behavior and characteristics, and distilled that discussion into four factors a sentencing court must consider when sentencing a juvenile defendant, namely: (1) the defendant's chronological age and characteristics, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the family and home environment that surrounded the defendant; (3) the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct; and (4) the possibility of rehabilitation (referred to herein as the "<u>Miller</u> factors").[1]  <u>Miller</u> at 476-78.

As set forth below, in connection with the analysis of the § 3553(a) factors, while the Court must consider the defendant's age, family and social background, and possibility of rehabilitation, these factors, and more importantly the facts and circumstances of the two murders, the subsequent murder conspiracy, and the defendant's ongoing conduct while incarcerated, weigh in favor of a substantial sentence for this defendant.

---

[1]    While the government acknowledges that the <u>Miller</u> decision is applicable to this case, the Court should note that there are significant factual distinctions between this defendant and the <u>Miller</u> defendants; most importantly, the nature of these murders and the premeditation present here, which was not the case in <u>Miller</u>.

B.     Analysis

Should the Court formally accept the Plea Agreement, the defendant must be sentenced within the agreed upon range of 35 to 45 years' incarceration. See Plea Agreement at ¶ 3 and Rule 11(c)(1)(C). In light of the sentencing factors set forth by Congress in § 3553(a), and even considering the Miller factors, the government respectfully submits that a sentence of 42 years is warranted in this case.

As an initial matter, with respect to § 3553(a)(1) and the third Miller factor (the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct), it is difficult to contemplate offense conduct that is more serious than hacking multiple people to death with machetes. Here, two unarmed young people, only 20 and 15 years-old, were each separately lured to a wooded area to socialize with who they thought were other young adults. Instead, Pineda and Castillo were both killed in the most horrific way imaginable, with multiple MS-13 members surrounding them, attacking them with machetes, and then burying them in the ground. Furthermore, as the Court observed in the Transfer Opinion, the defendant was the instigator for the Pineda murder, creating a fake Facebook account, pretending to be a female, and luring the victim to his death, and then as a hands-on participant in the murder. And although he did not instigate the Castillo murder in the same way, he was—only months after setting Pineda up to be killed—an active participant in delivering the savage blows to 15-year-old Castillo that ultimately killed him. Thus, the nature of the offenses, and further, the defendant's direct and violent participation in those offenses, supports the imposition of a significant sentence. Accordingly, a 42-year sentence is necessary to address the seriousness of the offense conduct and its consequences, including the terror, pain and suffering the young victims experienced and the lifetime of anguish for their family members, whose lives are forever devastated by the senseless and violent loss of their loved ones.

Consideration of the history and characteristics of the defendant, pursuant to § 3553(a)(1), and the defendant's chronological age and social background, the first and second Miller factors, likewise support a substantial sentence. In his sentencing submission the defendant argues that his age and social background, including economic instability, the absence of his father, and exposure to societal violence support a sentence at the bottom of the agreed-upon range. Def. Mem. at 10-13, 27. But while the defendant's age and background are certainly facts that the Court must consider when determining a proper sentence here, it is important to note that the defendant was "just over 16 when he [] instigated the murder of Pineda [and] 6 months away from his seventeenth birthday, when he participated in Castillo's murder," (Tr. Op. at 2), and 17 years old when he participated in a subsequent murder conspiracy and a drug trafficking conspiracy. Moreover, the defendant's circumstances growing up in El Salvador and after arriving in the United States are, unfortunately, not unique. As for El Salvador, the defendant said his early childhood as "happy," described being supported by his family, and had no legal or behavioral problems growing up. Tr. Op at 10. When he came to the United States to avoid violence in El Salvador, the defendant lived first in Texas and then on Long Island, but both times in the company of family members. Id. Once

10

he lived on Long Island, the defendant was gainfully employed, working as a landscaper, and although he ultimately rented his own room, he continued to see his brother nearly every day. Id.  Thus, although the defendant experienced certain challenges in his transition to the United States, he had the benefit of many positive social influences.  Indeed, he likely had more support than countless immigrants born in impoverished countries who suffer extreme hardships, come to the United States to escape those conditions and/or work to help financially support their families at home, and yet do not associate with violent street gangs and participate in brutal acts of violence.  Unlike many defendants who come here and are unsupervised, this defendant was reunited with family, attended church, had a job and was able to support himself.  Nonetheless, he committed two vicious murders within a matter of months—one of which he instigated—and after those experiences, he actively sought to commit a third murder, all while socializing with his relatively supportive family.  Thus, the defendant's deep commitment to the gang, despite these stabilizing and deterring familial influences, including access to school in his formative years and employment in his adolescent years, supports a substantial sentence.

Although the defendant was a juvenile at the time of his crimes, neither his role nor his actions were the product of impulsive or split-second decisions, which undermines any mitigating value attributed to a juvenile's impetuosity and inability to appreciate risks and consequences, as contemplated by the first Miller factor.  By actively participating in two extremely violent and premeditated murders in a span of months, the defendant demonstrated an unwavering commitment to the gang.  The defendant, along with his MS-13 co-conspirators methodically planned each murder.  As for Pineda, the defendant took the lead, creating a Facebook account and posing as a female for the sole purpose of setting up the victim.  As a result of the initial communications, the defendant affirmatively obtained approval from MS-13 leadership to murder Pineda, and recruited others to participate.  Thus, even though the defendant had ample opportunity to contemplate his actions, he was the person that instigated this murder. And after setting it up, he went on to physically participate, wielding a machete alongside his compatriots and then burying Pineda's body in a hole in the ground that they had dug in advance of the murder.  Less than five months later—hardly showing any signs of regret or remorse—the defendant participated in the brutal murder of 15-year old Javier Castillo, who was lured from Brentwood to Freeport by a fellow MS-13 member, and then, like Pineda, attacked in the woods with machetes by members of the gang, including the defendant.  Less than one year later, after having significant time to reflect upon his actions and with the benefit of time to mature, the defendant endeavored to kill another innocent person in July 2017.  As evidenced by the recorded calls, summarized above, he once again took the lead, bragging that he would bring the victim, with whom he was personally communicating, to the woods, again.  And but for the intervention of law enforcement, and the related arrest of the defendant, it is likely that he would have committed a third murder.  And even while incarcerated as an adult, the defendant still proudly maintains his allegiance to the gang.  These actions evidence the enthusiastic nature of the defendant's participation, as opposed to impulsivity.  Moreover, contrary to his assertion that he had a minimal role, it is clear that the defendant acted as an instigator, repeatedly, which undermines any claim of impulsivity or remorse.  In fact, the defendant had real options, and even more than others, and he instead chose to engage in violence on behalf of the MS-13, and he relished it.

11

Moreover, the government respectfully submits that, although the defendant did not have a criminal record before the instant offense, he committed these murders as a knowing and voluntary member of the MS-13 and in furtherance of its violent mission, which supports a significant sentence. The defendant argues, in support of his requested sentence, that he, a particularly vulnerable immigrant with prior exposure to violence, was merely a "member whose participation was more limited to execution." Def. Mem. at 28. But the defendant was not just a member of the MS-13, he was an enthusiastic participant in the gruesome acts of violence sponsored by the gang, which he embraced wholeheartedly. Based on his lived experience, he understood the violence perpetrated by the gang, and he fully embraced that mission. Additionally, the defendant was associated with an extremely violent clique of the MS-13, which committed at least nine murders between January 2016 and January 2017, often while working together with members of the Hollywood clique. Together, members of the Sailors and Hollywood cliques terrorized communities in Suffolk and Nassau Counties, committing not only murders but also brazen acts of violence. Based on the weapons, phones and photos recovered from the MDC, the defendant continues to enthusiastically identify with the Sailors clique of the MS-13 and embrace its violent mission. Thus, notwithstanding his lack of criminal history, the defendant should receive a substantial sentence because his crimes were committed as a knowing and enthusiastic participant of the MS-13 during an extremely intense period of violence.

Here, the recommendation of 42 years' incarceration is commensurate with the recommendations and ultimate sentences for other similarly situated individuals in this district who have pleaded guilty to committing murder on behalf of the MS-13. See, e.g., United States v. Jose Daniel Lopez, 20-CR-252 (JFB) (defendant, who was initially charged as juvenile and consented to transfer to adult status and had significant mitigation, pleaded guilty to participating in two murders, including the Pineda murder, and was sentenced to 412 months' incarceration, which was adjusted to 336 months' to account for time served on related state sentence); United States v. Jose Omar Sorto Portillo, 19-CR-423 (JFB) (defendant, who was initially charged as a juvenile and transferred to adult status, pleaded guilty to one shooting murder and a conspiracy to murder others, was sentenced to 30 years incarceration and government recommended a term at the high end of the Guidelines, which was 30 years); United States v. Carlos Argueta, 16-CR-510 (JFB) (defendant, who was initially charged as a juvenile and transferred to adult status, pleaded guilty to one murder and one attempted murder, was sentenced to 30 years and the government recommended 35 years); United States v. Jonathan Hernandez, 16-CR-403 (GRB) (defendant pleaded guilty to committing two murders and one attempted murder, he was sentenced to 43.3 years and the government recommended 35.75 years); United States v. Jeffrey Amador, 16-CR-403 (GRB) (defendant pleaded guilty to 2 murders and an attempted murder, the defendant was sentenced to 35 years and the government recommended 38 years). And although the defendant was a juvenile when he committed these crimes, given that he was 16 and then 17 years old and that his family history does not substantially distinguish him from many other immigrants who struggle socially before and after transitioning to life in this country, neither of these factors justifies a sentence that is at the bottom of the agreed-upon range. While these mitigating factors should be considered, the sentence must still be sufficient to address the defendant's important role in

12

the charged crime, the extreme violence and loss of life in this case. The government submits that a sentence consistent with counsel's request neither achieves that goal nor reflects the fact that the defendant committed these murders in furtherance of the violent mission of the MS-13 gang.

As set forth above, the "nature and circumstances of the offenses" and the "history and characteristics" of the defendant both strongly warrant a sentence of 42 years in prison, pursuant to § 3553(a)(1). Moreover, the Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh heavily in favor of a 42-year sentence.

As an initial matter, regarding factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, Long Island has been plagued by gang violence over the past two decades; especially violence perpetrated by members of the MS-13. Over the past decade, numerous MS-13 cases have been charged in this district, wherein dozens of MS-13 members and associates have been prosecuted for violent crimes, including more than 60 murders. A sentence of 42 years in prison would send a strong message that violent conduct such as that engaged in by the defendant and his fellow MS-13 gang members and associates will not be tolerated and will have severe consequences.

Additionally, and perhaps most significantly, with respect to factors § 3553(a)(2)(A) and (C), for the reasons set forth above, the murders of Kerin Pineda and Javier Castillo were extremely serious crimes that need to be adjudicated in a manner that will promote respect for the law, provide just punishment for the offenses, and protect the public from further crimes of the defendant. The government respectfully submits that a below-Guidelines sentence for a crime that left two innocent young people dead would fail to provide a just punishment that reflects the loss of life, the pain and suffering experienced by the victims, and the anguish of their family members. Further, as set forth above, the defendant was a knowing associate of the MS-13 and his willingness to commit two extremely brutal murders in such quick succession, as part of such a violent and destructive gang, makes him a greater risk of being a recidivist and committing additional violent crimes in the future.

Finally, as to the defendant's argument that his conditions of confinement, including during the pandemic, warrant a significant downward variance, the Second Circuit recently noted, in affirming a sentence where the district court came "down from the high end to the low end [of the Guidelines range]," that it was "aware of no authority suggesting that a district court imposing a sentence is obligated to assign even [that] much weight, let alone more, to the harsh prison conditions brought on by the pandemic." United States v. Edwards, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022) (holding that a sentence at low end of Guidelines range where court considered harsh conditions of confinement during pandemic, among other mitigating factors, was not substantially unreasonable). Here, the potential mitigating value attributable to the defendant's conditions of confinement is far

13

outweighed by the other § 3553(a) factors in this case, including, without limitation, the extreme acts of violence committed by the defendant, the need to protect the public from future crimes of the defendant, and to provide adequate punishment and deterrence for the defendant's crimes.

## III.    Conclusion

Although the defendant was a juvenile at the time of the crimes charged, he was an active member of an extremely violent MS-13 clique and played a critical role in two brutal murders and was the driving force behind another murder conspiracy, which would have almost certainly resulted in another death if law enforcement did not intervene, all on Long Island.  Nothing in the defendant's background justifies or explains such violence, and the § 3553(a) and Miller factors discussed above strongly warrant a significant sentence to deter the defendant and other MS-13 associates who are considering pledging themselves to the gang from committing similar horrific acts of violence.  For these reasons, and to protect the public from further crimes of this defendant, the government respectfully submits that the Court should sentence the defendant to 42 years' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney


By:    /s/ Megan E. Farrell
Paul G. Scotti
Justina L. Geraci
Megan E. Farrell
Assistant U.S. Attorneys
(631) 715-7836/7835/7862


cc:    Matin Emouna, Esq. (By ECF and email)
USPO Meaghan Wing (By email)
Clerk of the Court (JMA) (By ECF)